Flannery & Company *v.* Hightower *et al.*

1. Even as against a wrong-doer, an injunction will' not, at the suit of a stranger to the title or possession, issue to restrain a trespass and stay waste about to be committed by cutting timber upon land; and one is such a stranger who neither claims the legal title or the right of possession thereunder, nor is in actual possession of the premises, or some part thereof, by himself or another, under such claim of right as might ripen into a title by prescription.

2. A mere entry upon premises, followed by the erection of a house and the enclosure of a small portion of the land, even where the original entry was under color of title, when unaccompanied by an actual occupancy, is not such a prior possession as that, if the improvement be destroyed by fire, the person so entering can, by proof of such prior entry only, maintain as against any person a petition to enjoin the commission of trespass thereafter about to be committed by cutting the timber growing upon such land. In such a case, the *sub modo* right acquired by such entry, as against even a wrong-doer, extends only to the improvement made, and creates in him no title, legal or equitable, to any portion of the premises covered by such color of title. It would be otherwise, were the entry followed by occupancy.

3. Whether or not the cultivation of a turpentine farm upon a tract of land is such an occupancy as may be the basis of a prescriptive title to the land itself, is a question of fact dependent upon the character of the possession, the extent of the visible signs of occupancy and its continuance; and a charge is

not erroneous which submits such question for the consideration of a jury.

4. One who enters as a lessee of timber for turpentine purposes in subordination to the title of another, can neither attorn to a third person, nor, by accepting a concurrent lease from such third person, otherwise recognize a claim of the latter, adverse to that of his original lessor, without first surrendering to him the possession; and, therefore, while the possession of such a lessee continues, it is, in contemplation' of law, in right of and inures to the benefit of him under whom he originally entered.

5. A devise of "all of one's estate," or of a certain "plantation," described as being in a given county, is not void for uncertainty, and extrinsic evidence is admissible to show that a particular tract constituted a component part of the land intended to be embraced within such general descriptive terms.

6. A decree of cancellation can only be had at the suit of one holding the perfect legal or statutory title, and against an outstanding claim of title which operates as a cloud upon that of the rightful owner; hence, even though a plaintiff fail in his action for the want of a perfect title, a defendant may not, upon the prayer of a cross-bill, obtain a decree of cancellation as against the plaintiff unless he show a perfect title in himself. By evidence of possession only, or of an inchoate prescription, he may defeat a recovery by the plaintiff, but such evidence does not entitle him to the extreme affirmative relief afforded by the cancellation of the plaintiff's evidence of title.

7. The verdict, upon the substantial merits of the case, was right in so far as it found generally for the defendant; but the finding of the jury that the deeds of the plaintiff be delivered up for cancellation, was without evidence to support it and contrary to law. Direction is therefore given, that the judgment denying the motion for a new trial be affirmed, but that the verdict and decree be amended in the court below in accordance with the view above indicated, and the costs of this writ of error be taxed against the defendant in error.

December 13, 1895.

Equitable petition. Before Judge Smith. Dodge superior court. March term, 1895.

*DeLacy & Bishop,* for plaintiffs.

*D. M. Roberts* and *E. A. Smith,* for defendants.

ATKINSON, Justice.

Flannery & Co. filed a petition in Dodge superior court against Hightower *et al.*, to restrain them from cutting the

v 97-38

timber growing on certain lots of land in that county. The plaintiffs alleged that they were the owners of the lots, claiming title under and by virtue of certain deeds. Their paper title originated in a deed from Nicholas Rawlins to McVay & Choate, dated January 17th, 1882, and from the latter through a succession of conveyances, which appear to be regular, into John Flannery & Co. by deed dated 21st day of May, 1886. In addition, plaintiffs based their claim of title upon a claim of prior possession, alleging that they had actual prior possession of the lots of land in dispute, by means of a building erected thereon about the year 1887 or 1888, and before any of the timber was boxed for turpentine purposes, and before there was any kind of possession thereof by any person whatever; that they had constructed and placed a fence around said building, the same being a dwelling-house, and were preparing to continue and enlarge said improvements, when the house and buildings were burned and destroyed by some persons unknown; that thereafter they followed up the possession above referred to, by leasing the land for the purpose of and having the same worked for turpentine purposes, and by putting persons in possession of said land who are now in the actual possession of said lots clearing and improving them. Plaintiffs amended their petition by charging one William Ragan as a codefendant with the original defendants, and as a confederate aiding and abetting them in their wrongful act.

The original defendants filed an answer to the petition, denying that Flannery & Co. were the owners of the lots of land, or that they had ever been in possession of either of the lots; not admitting that the plaintiffs had leased the property for turpentine purposes to J. A. Williams & Co.; denying that Williams & Co. worked the timber for turpentine purposes under such lease; but alleging, on the contrary, that Williams & Co. had, previous to any lease which they may have accepted from Flannery & Co., leased the

two lots of land and timber thereon for turpentine purposes from Lloyd Smith, and that under and by virtue of this latter lease they had entered and boxed the timber for turpentine purposes, and were in possession under such lease at the time they accepted the alleged lease from Flannery & Co. The defendants further claimed that they entered upon the land in the right of J. W. Hightower in his capacity as receiver of the Empire Lumber Company, which latter company claimed its right of entry and to cut the timber under and by virtue of a lease from William Ragan, in whom it was alleged was the true legal title to the premises, and not in the plaintiffs.

William Ragan filed a petition, praying that he be made a party, alleging that Hightower, the receiver of the Empire Lumber Company, being in possession in subordination to his title, he was bound upon his warranty and therefore desired to be a party. He was made a party; and alleged that he held title to the property under and by virtue of a chain of title: (1) originating in one James Graham who, on the 1st day of March, 1859, conveyed to Lloyd Smith. (2) Possession of Lloyd Smith during his lifetime, and at his death by his tenants, Williams & Co., who boxed and worked the timber on said two lots of land under a lease from the said Lloyd Smith, bearing date January 22d, 1887. (3) The will of Lloyd Smith, bequeathing the land to Eliza J. Smith during her life or widowhood, and at her death or marriage to William Ragan. (4) A deed from Eliza J. Smith to William Ragan.

Thereafter William Ragan amended his cross-petition filed in the case; alleged that the plaintiffs' claim of title to the land in dispute was a cloud upon his title; prayed that the plaintiffs be perpetually enjoined from further interfering with him in his possession of the land or from further claiming title thereto, and that their deed be declared null and void and be canceled.

Upon the trial of the issues made in the cause, under the

pleadings above outlined, the plaintiffs introduced the following documentary evidence, to wit: (1) Warranty deed from Nicholas Rawlins to McVay & Choate, to lots of land Nos. 10 and 11 in 19th district of Dodge county, dated January 17th, 1882, consideration $400, recorded May 10th, 1882. (2) Mortgage, with power of sale, public or private, from McVay & Choate to John Flannery & Co., on said lots of land, and other property therein described, dated May 4th, 1882, to secure four promissory notes of same date for $3,000 each, recorded May 13th, 1882, and constituting John Flannery & Co. attorneys in fact for McVay & Choate. (3) Deed from John Flannery & Co., as attorneys in fact for McVay & Choate, to Patrick F. Gleason, to said lots and other property therein described, dated September 30th, 1885, consideration $850; and transfer thereof from P. F. Gleason to John Flannery & Co., dated May 31st, 1886, for value received; said deed and transfer recorded August 9th, 1886. (4) Lease from John Flannery & Co. to J. A. Williams & Co. to said lots 10 and 11 in 19th district, for turpentine purposes, for two years from February 17th, 1890, and recorded March 1st, 1892. (5) The wild land and general tax digest of Dodge county for the years 1875 to 1887 inclusive, showing that Lloyd Smith never returned either of said lots 10 or 11 in 19th district for taxation in any year during the period covered by said digests, though he returned other lands and property, and showing further that said lots 10 and 11 were returned for taxation during said period by Nicholas Rawlins, McVay & Choate, and John Flannery & Co., respectively.

Walker, a witness for the plaintiffs, testified: He was acquainted with the lots in question; had known them 8 or 10 years; first saw them in 1882 or 1883 or 1884. It was then pine land with timber on it, and no one living on it. Never saw any possession on it, only what I put on it before it was boxed. I had a building put on it, on No. 11 I

think.    I got David Darsey to put it there by contract for John Flannery & Co.    That was near two years before it was boxed.    The house was burned down soon after it was built; no one lived in it; don't know who burned it; we had nothing but very little fencing around there; that was before the boxing. , J. A. Williams and Co. boxed both lots. The Empire Lumber Company cut part of the timber.    I saw the timber on the ground—50,000 or 60,000 feet.    A great deal of it was hauled off.    Bass and Bryan are in possession of these two lots now, and have been nearly two years.    They went in since this suit.    They have a fence on the land, and are cultivating it.    I sold it to them as the agent of John Flannery & Co., and gave them a contract to make them a title if we recover in this suit.    I had the house built on the land.    Nobody ever lived in it.    It was burned soon afterwards.    There was a little fencing; none of it was ever cultivated.

Morgan testified for the plaintiffs:    About ten years ago he went to the two lots in controversy, to trace the lines. At that time the land had not been boxed.    He went there with Lloyd Smith.    He was not in possession, and was not setting up any claim to these two lots at that time, but told me they belonged to Choate and Flannery.

Johnson testified for the plaintiffs:    I have known the lots in controversy for five or six or seven years.    They were then not boxed.    They were original forest and no improvements on them.    We had a house built on them afterwards by Mr. Walker, agent for Flannery & Co.    I suppose it was on the line between 10 and 11.    I did not see it; it was burned when I went out there.    I saw the remains; that was before the land was boxed. Flannery & Co. had a deed to the land, and put it in the hands of Walker to look after, as well as other lands in the adjoining county and in this county.    Flannery & Co. paid taxes on these lands, and looked after them to see whether they were intruded on and to see that the timber was taken care of.

Walker went there with me. I saw Lloyd Smith occasion-
ally when he was living; had a conversation with him at
Eastman about these two lots. The first time I met him
was in the store of W. F. Harrell. He was a partner of
Mr. Harrell, who introduced me to him. I learned in the
conversation that Mr. Smith had been living a good while
in the 19th district and had lands in that district. As we
owned lots 10 and 11 in that district, I proposed to Mr.
Smith to sell them to him. He said, "I have got plenty of
land and don't want to buy. I have got as much land as I
want." He did not set up any claim to these two lots.
These lots have since been boxed for turpentine purposes.
When I went out there I saw the remains of the house that
had been burned. I went out there two or three times.
We paid Walker for building the house, who was our agent
to build the house. The house was built on the line of the
two lots. It was a log house. I made the lease for Flan-
nery & Co. to J. A. Williams & Co. I think we had in-
formation then that Williams & Co. had leased the land
from Lloyd Smith. J. A. Williams represented J. A.
Williams & Co. Mr. Carson of the firm was the man we
negotiated the contract with. I think we then had infor-
mation that it had been leased and that J. A. Williams &
Co. had the management of it. We did not get the infor-
mation from Williams & Co. Don't remember what they
said at the time. They have not paid for the lease; they
are waiting until this litigation is settled, to pay us. They
are perfectly solvent and could give a sight check that
would be honored at any time.

The defendants introduced the following documentary
evidence: (1) Deed from James Graham to Lloyd Smith,
to lots 10 and 11 in the 19th district of Pulaski county,
dated March 1st, 1859, consideration $100, recorded in
Dodge county September 22d, 1887. (2) Lease from
Lloyd Smith to J. A. Williams & Co., for said two lots for
turpentine purposes, for a term of 3 years, to commence

when the timber is boxed, dated January 22d, 1889, consideration $300. (3) Will of Lloyd Smith, dated January 29th, 1890, who devised as follows: "I give and bequeath to my wife Eliza J. Smith my entire estate during her widowhood, and all of my property, both real and personal, I devise to her during her natural life, if she remain unmarried and a widow; said property, all of which I now bequeath and can mention, is as follows: One plantation known as the old Lloyd Smith plantation; also the plantation known as the Rockmore plantation; also the Darsey plantation; and all other lands are included herein, which I bequeath and devise as herein mentioned; and said plantations being in the 19th district of Dodge county; . . and if she does marry and is no longer a widow, I desire all of my property herein mentioned, and all I own, both real and personal, to go to William Ragan and his heirs, which I devise all my property both real and personal." (4) Deed from Eliza J. Smith to William Ragan, dated November 21st, 1891, and recorded November 27th, 1891, which conveyed as follows: "All her life-interest and title as conveyed by the will of Lloyd Smith, dated on the — day of February, 1890, now of record in the ordinary's office of Dodge county, to the real and personal property therein mentioned and described, except certain property, . . . which property so excepted having been this day deeded by William Ragan to Mrs. Eliza Jane Smith in consideration of her surrender of her interest, right and life-estate to all the property under the will of Lloyd Smith, deceased, made in February, 1890, and recorded in the ordinary's office, and the said Eliza J. Smith conveys all of said real and personal property not herein excepted, to the said party of the second part, as fully and completely described the will of said Lloyd Smith, deceased, and deeds held in his name."

William Ragan testified: The deed from Eliza Jane Smith to myself was intended to convey these two lots of land, and the land in dispute is part of the land conveyed

to me in the deed and by the will of Lloyd Smith. I signed the lease from Lloyd Smith to J. A. Williams & Co., as a subscribing witness, and saw the other witness sign it and saw Lloyd Smith make his mark there. Walter Hartman signed J. A. Williams & Co. They boxed the timber under that lease. The lease was made in the fall, and it was boxed in the spring following. Lloyd Smith died in 1890. He was in possession then. He had it boxed for turpentine under the lease. These lots were wild in the woods before they were boxed. No house on them that I knew of; think I would have known if there had been. There was no cleared land. Can't tell whether any house was ever built on it or not. If there was, I did not see it. Suppose I have known the lots 10 or 12 years, ever since I was a yearling boy. Lloyd Smith in his life paid taxes on it and leased it to J. A. Williams & Co. They boxed it all I think; boxed one lot that year and that fall they boxed the other. Lloyd Smith was a poor scribe, and while he could write his name, he generally signed his name to notes, and to other papers he made his mark. I was in possession when the suit was brought.

Hightower, sworn for the defense, testified: Hosford had bought this timber before I knew anything about it. I was operating the Empire mill as receiver in the case of Kiser *et al. v.* Empire Lumber Co. *et al.* We had to buy timber to operate it. Hosford bought timber, and it was paid for in the office. Hosford was acting under me as receiver. We paid Ragan $70.25. We were to pay Ragan fifty cents per 1,000 feet for the timber. Hosford bought the timber before this suit, under orders from me to buy timber. There was $91.25 in all paid Ragan. The timber is not all cut. We were enjoined. Hosford was authorized to buy timber from Ragan or Flannery either.

Hosford, for the defense, testified to the same effect.

It was admitted that Hightower was appointed receiver by the court, and that he was authorized to buy timber for the purpose of carrying on a saw-mill business.

J. A. Williams, sworn as a witness for the defendant, testified: I know the lots in question. I boxed them for turpentine purposes for J. A. Williams & Co.; one lot in the spring of 1889 and the other in the fall of the same year. We leased it from Lloyd Smith. We boxed them before the lease from Flannery & Co. to J. A. Williams & Co. It was wild land when I boxed it. If there was any clearing on it, I did not see it. I saw no indications of it. If there was any deadening I never saw it. We remained in possession under Lloyd Smith's lease four years. We were in possession when he died. T. A. Williams, J. P. Williams and J. A. G. Carson compose the firm of J. A. Williams & Co. The lease from Flannery & Co. was made in Savannah. The signature is Carson's writing. I knew of the lease some time afterwards. They, J. P. Williams and Carson, knew of the Lloyd Smith lease at the time they took lease from plaintiffs. I think it was 1887 I first knew of the land. I think some time after that I saw a shanty on it, but don't remember seeing it after 1887. Don't know who put it there. It was close about the line between 10 and 11. It was afterwards burned. I saw Mr. Darsey up there. Lloyd Smith had no possession, except the turpentine trees. Turpentine possession is boxing the trees in winter and working them in summer. Worked them 3 or 4 years. We commence about this season and work them until October. Have to go there in the fall and rack around the trees to protect the boxes from fire. From March to October it takes about one chipper to the lot, and one dipper to two lots. They are there all the time. Woodsman is there. They haul the gum out, chip it every week, dip it about every four weeks. Unless he is a blind man, it is not possible to go through a lot of land that has been turpentined, without seeing that it is being used for turpentine purposes, and any improvements that might be made on it. We chip the trees about five feet from the ground. The faces of the boxes are about 14 inches on

large trees and 10 inches on small trees. By boxing, we mean cutting a notch in the tree with an ax, to hold the turpentine. By dipping, we mean going over it every week and gathering the crude turpentine in boxes. By hacking, we mean cutting a fresh streak from the tree, which we take off with a hack with low boxes and a puller with high boxes. That cuts a streak in the side of the tree, 14 inches wide and five feet high. In a very large tree we cut as many as five boxes. In a small tree we generally average about two boxes. I gave Lloyd Smith a draft for $300 for the lease from him for the two lots. Witness knows nothing about the consideration of the Flannery & Co. lease. Witness worked No. 11 four years and No. 10 three years. Paid Ragan for the fourth year.

1. In the case of *Nethery et ux.* v. *Payne*, 71 *Ga.* 379, this court, recognizing the general rule prevailing in courts of equity touching the power of such courts, by injunction, to restrain trespass and stay waste, has stated the rule broadly to be: "It may be laid down as a general rule, that equity will not restrain waste except upon unquestionable evidence of the plaintiff's title; nor will equity interfere by injunction to prevent waste when plaintiff's title is not clear; and when there is grave doubt whether an action at law could be sustained for the alleged waste, it is proper to refuse the injunction." This rule is a simple recognition of the general principle, that one is not entitled to invoke the extraordinary powers of a court of equity, unless he can establish, in a manner satisfactory to the law, the fact that he will suffer an irreparable injury in his estate. Unless the estate be his he can suffer no injury, and unless the title be in him there is no estate; and hence, in the absence of title to the property upon which the trespass is about to be committed, the courts cannot extend to him any aid, and will not, at his suit, interfere to inquire whether another who is in possession and enjoyment of the estate be rightfully so or not. If such other person be a

wrong-doer—a mere trespasser, it can be a matter of no concern to one who is not himself the owner and who has no interest in the estate, resting either upon absolute title, or such a possession as may amount to an inchoate prescription. A person in possession under color of title, or in the actual possession of premises, though he be not the owner of the strict legal title, if his possession be in good faith, might be, under certain circumstances, entitled to maintain a petition for injunction against a bare trespasser who was himself insolvent, and who could not answer in damages for his wrongful act in interfering with a person holding such possession.    But if a person be a stranger both to the title and possession, then injunction will not issue, at his instance, to restrain a trespass or to stay waste about to be committed upon land occupied by another; and if such person neither claims the legal title or the right of possession thereunder, nor is in the actual possession of the premises, or some part thereof, by himself or another, under such a claim of right as might ripen into a prescription, he cannot be other than a stranger to the title or possession. The institution of a suit by such a person would be wholly gratuitous, and courts of equity will not grant relief upon the prayer of such a volunteer. .

2. In the present case it appears from the evidence, that the plaintiffs, under color of title, entered upon the premises in dispute, and upon the line between the two lots erected a small house and made a small inclosure, including a very small portion of each of said tracts of land.    The house was never occupied by them, nor by any person for them.    Soon after its erection and before its occupancy, it was destroyed by fire and with it the inclosure surrounding it.    The plaintiffs do not claim the legal title to the premises, but rest their title to the land upon a prescription based upon this entry, and upon the faith of such prescription they pray an injunction against the defendants, who claim likewise to have entered under a prescriptive title.

An actual possession of some portion of a tract of land is indispensable to the creation of a title by prescription. It is the outward visible sign of occupancy, and not the mere intention to occupy, which, coupled with an entry in good faith, constitute the elements of a prescriptive title. A mere entry, unaccompanied by an actual occupancy, is no possession at all. It indicates a purpose to occupy, which purpose, if carried into actual execution by a continuous occupancy for the period of time prescribed by law, will give a prescriptive title, but if the possession itself be discontinued, the person entering cannot, by proof of such prior entry only, maintain against another person a petition to enjoin the commission of a trespass thereafter about to be committed by cutting the timber growing upon such land. In such a case, the right acquired by such entry, even as against a wrong-doer, extends only to the improvement actually made. Of course, whether rightfully or wrongfully, if one build a house upon the land of another for the purpose of occupying it, and a stranger should come along and destroy the house, while the builder of the house would have no title to the land and no title to the house as against the true owner, he would still, as against a mere wrong-doer, be entitled to the possession, and would be entitled to recover as against such wrong-doer any damages for his interference with that possession. But a mere entry under color of title, if the entry be not prosecuted or supplemented by an actual occupancy, would give no right in favor of the person entering against any other person who might likewise choose to enter upon the land. The *sub modo* title of one squatter in actual occupancy will prevail against the claim of another one who attempts to squat; and hence that rule of law recognized by our code, that a plaintiff in ejectment may recover the premises in dispute upon his prior possession alone, against one who subsequently acquires possession of the land by mere entry, and without any lawful right whatever. It

will be observed, however, that the right of the plaintiff to recover in such a case is dependent upon his prior possession, and does not arise upon his prior entry only. In the present case, had the original entry of the plaintiffs been followed up by subsequent occupancy and possession, they might have prevailed against one who sought to enter under no better title, but their misfortune is, they are in the position of showing no title to the land in dispute either by title or possession.

3. The defendants claimed a prescriptive title to the premises, based upon an occupancy, evidenced by a continuous working of the timber growing upon the land in dispute, for turpentine purposes; and upon the question as to whether or not an occupancy of such a character could be the basis of a prescriptive title, the court charged the jury as follows:   "If you find from the testimony that this land was used for turpentine purposes by the defendant Ragan, and that was such use and occupation of it under this provision of the law, which is so notorious as to attract the attention of every adverse claimant and so exclusive as to prevent actual occupation by another.   If you find from the testimony that the cultivation of the trees for turpentine purposes; that the land was boxed, or that the timber was boxed; that for a considerable portion of the time during the year, they chipped and hacked, and the hands were continually dipping turpentine from the trees, and the employees were hauling the turpentine away, and that the trees were racked around to protect them from fire, I charge you that this would be actual possession, if you find it to be true."   Exception was taken to this charge, as amounting to an expression of an opinion upon the weight of the evidence.   While we do not entirely approve the exact form of expression employed by the circuit judge, we are not prepared to say that this charge violates the provision of our code against the expression of an opinion by the circuit judge upon the evidence submitted in a case.   It will be

observed that the charge of the court first submits to the
jury the question as to whether the land was used for tur-
pentine purposes by the defendant Ragan, and whether
such use and occupation of it, under the provisions of the
law, was so notorious as to attract the attention of every
adverse claimant, and so exclusive as to prevent actual
occupation by another. If this were true, that would be
an actual occupation of the premises, and the mere fact
that the judge thereafter enumerates in his charge cer-
tain circumstances which might indicate an actual occu-
pancy or possession, is not erroneous, in view of his correct
statement of the general proposition left to be determined
by the jury from the evidence. The question as to whether
or not a possession was held under such circumstances as to
be the basis of a prescriptive title, is always a question of
fact for the jury, and our law does not undertake to say
what amounts to actual possession, except in so far as it says
that actual possession is evidenced by inclosure or cultiva-
tion. Inclosure and cultivation are specific acts indicating
occupancy of the premises, but occupancy may be evi-
denced by means other than inclosure or cultivation, for
the same section of the code provides that any use and
occupation of the premises which is so notorious as to attract
the attention of every adverse claimant and so exclusive as
to prevent actual occupancy by another, will be sufficient
upon which to found a title by prescription.

Whether or not the cultivation of a turpentine farm upon
a tract of land is such an occupancy and so notorious, is a
question of fact dependent upon the character of acts relied
upon to constitute such a possession. In determining this
question, the jury are to look to what are the visible signs
of occupancy.

In the present case, according to the evidence as it is dis-
closed by the record, it appears that every pine tree upon
the tract of land, available for that purpose, had been boxed
and worked for turpentine purposes; that in the process of

boxing, hacking, dipping, scraping and racking round the trees, there was scarcely a day in the year upon which there was not some servant of the defendants actually employed upon this tract of land, at work in such a manner as to indicate to the most casual observer a purpose upon the part of the person in possession to appropriate the land to his own exclusive use, rather than as indications of mere predatory invasions of the property by a casual trespasser. Upon this evidence, the court submitted to the jury the question as to whether such occupancy was so notorious as to attract the attention of every adverse claimant, and so exclusive as to prevent actual occupation by another; and we think not only that the evidence justified the instruction of the court upon that point, but justified a finding by the jury of such an occupancy in accordance with the instruction.

4. It appears from the record in this case, that Williams & Co. entered upon the premises in dispute under a written lease from Lloyd Smith, and boxed the timber for turpentine purposes under such lease; that thereafter, without surrendering the property to their lessor, they accepted a lease from the plaintiffs in this case, and continued to work the timber thereafter under both leases. Upon this possession of Williams & Co., claiming them as their tenants, the plaintiffs seek to found a prescription. We think this cannot be allowed, for Williams & Co. having entered under and in subordination to the title of Lloyd Smith, their possession was his possession until a formal surrender by them to him. No rule of law is better settled, than that a tenant cannot attorn to a person other than his landlord; and it would be a strange anomaly if Williams & Co., entering under the lease from Lloyd Smith, could, by the acceptance of a concurrent lease from these plaintiffs, recognize such a claim of the latter as to make their possession under such lease adverse to that of their original lessor. We are constrained to hold, then, that so long as Williams & Co. remained in possession without surrendering to the

original lessor, their possession was the possession of such original lessor; it is, in contemplation of law, in his right and inures to his benefit, and to the benefit of those who hold under him.

5. Upon the trial the will of Lloyd Smith was offered in evidence, and was objected to upon the ground that the devise to Eliza J. Smith, under whom these defendants claim, if intended to convey the property in question, was void because of uncertainty. This objection was overruled and the will admitted. The devise, it will be observed from the statement of the contents of the will as it herein-before appears, bequeathed to Eliza J. Smith the entire estate of the testator, both real and personal, during the time she remained unmarried. The testator undertook further to describe the property, "all of which I now be-queath and can mention, is as follows: One plantation known as the old Lloyd Smith plantation; also the planta-tion known as the Rockmore plantation; also the Darsey plantation; and all other lands are included herein, which I bequeath and devise as herein mentioned; and said planta-tions being in the 19th district of Dodge county. . . ." So it will be observed that he devised all of the property, both real and personal, of which he died possessed. The next question is, did he die seized and possessed of the premises in dispute? The evidence answers this question in the affirmative. It is not essential to the validity of a deed or grant that it should describe with absolute math-ematical precision each piece of property intended to be conveyed. If the conveyance be such as to distinguish the property intended to be conveyed from other property re-maining in the testator, general words will suffice. If the intention of the devise be to convey all of the property of the testator, such general description will suffice, and ex-trinsic evidence is admissible to show such property as was in the testator and such as was necessarily included in the general terms employed by him in devising it. At last,

the question of description is one of degree only, and if the conveyance be of an entire estate, parol evidence is admissible to ascertain the geographical extent and limit of the property covered thereby.

6. The defendants filed an amendment to their answer, in the nature of a cross-bill, by which they prayed that the deeds of the plaintiffs be delivered up for cancellation; and the jury having found in their favor, the court decreed a cancellation of the deeds under which the plaintiffs claimed title to the premises in dispute. Neither the plaintiffs nor the defendants in this case claimed under a grant from the State, nor showed themselves in privity with the original grantee. Both claimed by prescription only. The claim of title in the defendants, through Lloyd Smith, rested upon a deed made by James Graham to Lloyd Smith in the year 1859, and upon a possession in Lloyd Smith through Williams & Co. who entered in subordination to his title. Before a prescriptive title had ripened in favor of Lloyd Smith and those holding under him, this petition was filed. The claim of title in the plaintiffs rested upon a deed made by Nicholas Rawlins to McVay & Choate, dated January 17th, 1882, and upon a regular succession of conveyances from McVay & Choate to the plaintiffs in the present case, supported by an alleged entry upon the part of the plaintiffs under and by virtue of which upon the line between the two lots they constructed a small house to which we have heretofore referred, and further supported by their claim of possession through Williams & Co. as their tenants.

As we have heretofore shown, a mere entry, even by the erection of the house in question, unsupported by an actual occupancy or possession thereafter, was not of itself a sufficient basis for a prescription. Upon the point of actual possession, the defendants, from the evidence, seem to have the higher and better right. At all events, the jury have found against the claim of prior possession by the plaintiffs, and in favor of the claim of prior possession upon the part

v 97–39

of the defendants. Neither the plaintiffs nor the defendants at the time of the institution of the action had either a perfect paper or prescriptive title, and therefore neither was as against the other entitled to a cancellation of the papers of their adversaries as a cloud upon their title. Having no title, there could be no cloud upon it. It may menace the prior possession, but until such a time as the prior possessor acquires a good prescriptive title, he cannot, upon the theory of his possession, obtain a decree of cancellation as against an outstanding claim of title in another person. As to what constitutes a cloud upon the title of another, see *Thompson* v. *Etowah Iron Co.*, 91 *Ga.* 538.

In the present case, the prior possession of the defendants was sufficient to protect them against a verdict for the plaintiffs, but it gave to them no right to the affirmative relief prayed for in their answer. It is one thing to show such a state of facts as will defeat a plaintiff's right of recovery, and entirely a different thing to show such a state of facts as would entitle a defendant himself to recover over against the plaintiff. Whether or not the title of the plaintiffs can hereafter avail them anything is not a question now for consideration. We only hold that in this proceeding the defendants, upon the prayer of their cross-bill, were not entitled to have it cancelled.

7. Looking through the entire record in this case, we are fully persuaded that the verdict, upon the substantial merits of the controversy, was right, in so far as it found generally in favor of the defendants; but we do not approve the finding of the jury, that the deeds of the plaintiffs be delivered up for cancellation. This finding was without evidence to support it, and contrary to law. In affirming the judgment of the court below, direction is given that the judgment denying the motion for a new trial be affirmed, but that the verdict and decree be amended in accordance with the view above indicated, with costs of this writ of error to be taxed against the defendant in error.

*Judgment affirmed, with direction.*